UNITED STATES of America, Appellee,

v.

Armand MUCCI, Appellant.

Nos. 79–1183, 79–2219.

United States Court of Appeals,
Tenth Circuit.

Aug. 15, 1980.

Paul H. Hentemann, Willowick, Ohio, for defendant-appellant.

William E. Zleit, Atty., Dept. of Justice, Washington, D.C. (James P. Buchele, U.S. Atty., Wichita, Kan., with him on the brief), for plaintiff-appellee.

Before BARRETT and DOYLE, Circuit Judges, and MILLER, Judge.[*]

MILLER, Judge.

Appellant was convicted by a jury on two counts of a four-count indictment, namely: Count 2—Conspiracy involving the interstate transportation of stolen property; and Count 3—Interstate transportation of stolen property, aiding and abetting.[1] His motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial was denied.[2] He was sentenced to five years' imprisonment on each count, the sentences to run concurrently.

### The Indictment

Count 1 of the Indictment charged that, in violation of 18 U.S.C. §§ 2314 and 2,[3]

---

[*] The Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

[1] Appellant was not charged in Counts 1 and 4. Two other defendants tried with appellant on Counts 2 and 3, Robert Bendis and Andrew D'Amato, were also found guilty on Count 2; Bendis was found guilty on Count 3, but the jury could not agree on D'Amato's guilt on Count 3, and the district court declared a mistrial thereon.

[2] On February 22, 1979, appellant filed his notice of appeal, and on August 3, 1979, his record on appeal was docketed with this court under case number 79–1183. On August 27, 1979, appellant filed a second motion for a new trial before the district court which was denied; notice of appeal from this ruling was filed on November 19, 1979, and the supplemental record on appeal was docketed with this court under case number 79–2219 on November 27, 1979. On December 6, 1979, upon appellant's motion, this court ordered the two appeals consolidated.

[3] **18 U.S.C. § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting**

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2. Principals

Alfredo Proc, a/k/a Frederick Pro, Larry Nash Mangiameli, a/k/a Dorian Gray, and others devised a scheme to obtain money from one Bernard F. Baker by means of false and fraudulent pretenses, representations, and promises; that their scheme included doing business as Trident Consortium Funding Corporation ("Trident"), which would be represented as having off-shore sources of credit for long-term financing; that Pro and Mangiameli would induce Baker to travel to New York City for the purpose of seeking assistance from them and Trident in obtaining a loan of $5.5 million, to be used for the development of South Slope Farms in Idaho; that Baker would be induced to pay an advance fee of $110,000, with the understanding that, if the financing was not obtained, it would be returned save for $1,000 to cover expenses; that there was no intent to obtain off-shore credit or to return the advance fee; and that, on or about June 5, 1977, Pro and Mangiameli did induce Baker to travel in interstate commerce from Kansas to New York City to secure from him the advance fee of $110,000 pursuant to the aforesaid scheme.

Count 2 of the Indictment charged that, between June 6 and 17, 1977, Pro, Mangiameli, Armand Mucci (appellant), Phillip Kitzer, Andrew D'Amato, and Robert Bendis, in violation of 18 U.S.C. § 371,[4] willfully and knowingly conspired—

to transport and cause to be transported in interstate commerce between New York, New York, Cleveland, Ohio and Tribune, in the District of Kansas, a security, to wit: a bank money order, No. 237828, dated June 6, 1977, payable to Trident Consortium, drawn on the First National Bank of Tribune, Kansas, in the amount of one hundred and ten thousand

dollars ($110,000.00), and of a value of one hundred and ten thousand dollars ($110,000.00), knowing that said money order was converted and taken by fraud, in violating of Section 2314, Title 18, United States Code.

It was further charged that Pro would instruct Mangiameli to take with him to Cleveland, Ohio, from New York City said bank money order and that Mangiameli would do so, being provided by Pro with documentation to aid in the deposit and cashing of the money order, both defendants knowing that the money order had been obtained from Baker by fraud. It was further charged that Mucci, Kitzer, D'Amato, and Bendis would receive the money order from Mangiameli, knowing that it had been obtained by fraud, and would cash or deposit it for collection. Specific overt acts charged that involved appellant are summarized below:

On or about June 6, 1977, Pro in New York City told appellant in Cleveland, Ohio, by phone that Pro would receive a money order for $110,000 the next day.

On or about the same date, in Cleveland, Kitzer, D'Amato, and appellant discussed methods of cashing the money order.

On or about the following day, Pro in New York City told appellant in Cleveland by phone that he would send someone to deliver the money order to appellant in Cleveland; Pro endorsed the money order as "Director-USA" for Trident and gave it to Mangiameli (an employee of Trident) with instructions to go to Cleveland with a resolution of Trident pertaining to the cashing of the money order.

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

4.   18 U.S.C. § 371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

On or about June 8 Mangiameli traveled from New York City to Cleveland with the money order and met with Kitzer, appellant, and Bendis to discuss the cashing of the money order; they agreed to deposit the money order in the trust account of Bendis at the Cleveland Trust Co.; Bendis obtained Mangiameli's signature on a letter authorizing deposit of the money order and disbursement of funds and stamped or caused to be stamped on the back of the money order: "Pay to the order of the Cleveland Trust Company, For deposit only, Robert I. Bendis, Attorney at Law, Trust Account 10850–0749." On or about June 9, Bendis telephoned appellant to advise that Cleveland Trust Co. would not accept the money order. He was told to retrieve the money order and bring it to Kitzer and appellant at the Shaker House Hotel in Cleveland, which he did. Kitzer and appellant then went to the Beachwood Branch, Central National Bank of Cleveland, where appellant represented to the bank manager that he recently closed a deal with Trident and that the money was his fee; appellant agreed to deposit the money order for collection in a new account, "Armand's Inc.," endorsed the money order "Armand's Inc., by Armand L. Mucci, Pres.," and gave it to the bank manager for collection.

On or about June 14, appellant and Kitzer caused the money order to be transmitted in interstate commerce from Cleveland to Tribune, Kansas; and on or about June 17, appellant telephoned Kitzer to advise

that the money order had cleared and cash was available for disbursement.

Count 3 of the Indictment charges that, in violation of 18 U.S.C. §§ 2314 and 2, on or about June 14, 1977, Pro, Mangiameli, Mucci, Kitzer, D'Amato, and Bendis caused to be transported in interstate commerce from Cleveland,. Ohio, to Tribune, Kansas, bank money order No. 237828, dated June 6, 1977, payable to Trident and drawn on the First National Bank of Tribune in the amount of $110,000 the said defendants knowing the same to have been converted and taken by fraud.[5]

### Opinion

1. The fraud issue.

■ Appellant argues that the district court erred, as a matter of law, in not directing a verdict in his favor because, at the time he negotiated the cashing of the $110,000 money order endorsed by Trident, "Trident had not breached its contract with Bernard Baker" and "had better than thirty days in which to perform on its contract with Baker";[6] that the money order was transported from New York City to Cleveland not for the purpose of any fraud, "but only because Trident was in no position to collect the money . . . ." However, considering the evidence most favorable to the Government, which is a mandated principle of our review,[7] it is clear that appellant had knowledge that the $110,000 money order had been converted and taken by fraud and was a principal in both conspiring to cause the money order to be transported in interstate commerce and in causing it to

5. Count 4 relates to Count 1 and, therefore, need not be discussed.

6. The "contract" was a letter signed by Pro which he gave to Baker and Baker's partners in New York City. It states, in pertinent part:
   We are pleased to confirm our willingness to process our financing loan arrangement for the amount of five million five hundred thousand dollars ($5,500,000.00) for reference property based upon the following terms and conditions:

   .    .    .    .    .

   COMMITMENT FOR THE LOAN:
   The pre-advice commitment shall be issued not later than the sixteenth of June 1977 with

the finalization by the sixth of July 1977. The execution of this document shall also serve as receipt for a deposit of one hundred ten thousand dollars ($110,000.00) which in any event whatsoever that precludes the funding of this loan shall be returned less one thousand dollars ($1,000.00). The balance of the fee of six percent (6%) shall be payable out of the proceeds of the funding that resulted from this loan.

7. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Wolf*, 561 F.2d 1376, 1378 (10th Cir. 1977).

be so transported with such knowledge.[8] Kitzer testified that in early May of 1977 in Cleveland he informed appellant and other defendants in detail about Pro's advance fee swindle being operated through Trident in New York City. He further testified, as did Pro, that, at a later May of 1977 meeting in New York City attended by appellant and other defendants, Pro discussed his advance fee scheme and said he wanted "paper"[9] to "stall" various advance fee victims for which appellant, Bendis, D'Amato, and Kitzer were to receive $30,000 (Trident checks totaling this amount, but not covered by sufficient funds at the time, were given to appellant by Pro). Pro testified that, at this meeting, appellant told him that the Trident office was "too hot" and would probably be raided by the FBI; that thereafter they met at the Essex House Hotel. One Sy Guthrie, an officer of Trident and a convicted con artist with whom appellant had prior business dealings, testified that a few days later appellant told him that Trident was a "scam"[10] and that Pro had ripped off Baker's $110,000 money order and that he (appellant) was going to rip off Pro. Kitzer testified that Mangiameli, upon his arrival in Cleveland with the money order,[11] assured appellant and the other defendants that the money order was "good" and said that it had been brought to Trident by some cowboys and given to Pro on a potato farm deal "we never expected to work . . . Fred gave them one of his famous contracts. They accepted." FBI agents James Wedick and John Brennan testified that they were present and that Mangiameli also indicated that the money order had been ripped off by Pro from the cowboys. The foregoing and other testimony, exhibits, and stipulations of the parties fully support the charges against appellant in Counts 2 and 3.

█ The fact that, at the time appellant negotiated the cashing of the money order, Trident had thirty days in which to perform on its contract with Baker is of no avail to appellant in the face of evidence that the contract was fraudulent from the beginning, there being no intent to perform and no intent to return the money, and that this was known to appellant. The statutory language (18 U.S.C. § 2314), "knowing the same to have been . . . taken by fraud," admits of no exception such as that advanced by appellant, and no cases to the contrary of precedential value in this court have been cited by appellant. As stated in *Gay v. United States*, 408 F.2d 923, 927 (8th Cir.1969), title is not a defense where title and possession are secured as a result of fraud. *See United States v. Walls*, 577 F.2d 690 (9th Cir.1978); *United States v. Allard*, 458 F.2d 1136 (3d Cir.1972). The following statement from the court's opinion in *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir.1973) is particularly applicable:

> Essentially, a scheme to defraud is measured by a nontechnical standard. "It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society" . . . . .

---

8. The Government correctly points out that appellant was not charged with defrauding Baker but, rather, in Count 2, with conspiring to cause the money order to be transported in interstate commerce knowing it had been obtained by fraud; in Count 3, with causing the money order to be transported in interstate commerce with such knowledge.

9. Pro testified that by "paper" he meant "fraudulent paper"—"phony CD's, phoney letters of credit and so forth"; also "references which were our own briefcase banks. And the customer may leave and come back after an hour and call these briefcase banks and we have already prearranged, and the people would answer, 'Oh, Trident is, of course, worth $5,000,000.00,' or something like that."

10. A "scam" is "U.S. slang—dishonest scheme and a swindle." Barnhart, *Dictionary of New English Since 1963* (1973).

11. Kitzer also testified that appellant told him they (the defendants) were to cash the money order, take the $30,000 for which the insufficient fund checks had been written, and return $80,000 to Pro and Guthrie at Trident; that they "all knew that nothing was going back to New York" and that appellant said "if Fred Pro was dumb enough to send $110,000 to Cleveland not one dime was going back to New York. He was taking the whole thing."

. . . All that is necessary is that it be a scheme reasonably calculated to *deceive* persons of ordinary prudence and comprehension. The intent of the crime is shown by the scheme itself—. . . .

See also *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978) and cases cited therein.

Accordingly, we hold that there was no error in the district court's denial of the motion for acquittal notwithstanding the jury's verdict.

2. Issue of admissibility of statements by Mangiameli.

█ Appellant argues that the district court committed prejudicial error in admitting, over objection, the "hearsay testimony" of Mangiameli as related by Kitzer. The latter testified that, after appellant had met Mangiameli at the Cleveland airport and had received the $110,000 money order from him, they (Kitzer, appellant, Mangiameli, Bendis, and D'Amato) met in the coffee shop of the Shaker House Hotel and that he asked Mangiameli "Where did you guys get this thing [the money order] from?" and that Mangiameli replied: "Those cowboys brought this, the farmers . . . [on] the potato farm."

The court overruled the objection on two grounds: (1) applying the rule under *United States v. Andrews*, 585 F.2d 961 (10th Cir.1978), there was "sufficient and adequate evidence" of the existence of a conspiracy to warrant admissibility under Rule 801(d)(2)(E) of the Federal Rules of Evi-

dence;[12] (2) the Mangiameli statement was made in the presence of all the defendants and was offered for the knowledge and intent of the defendants of the fraudulent nature of the money order and its source.

We are not persuaded that the district court erred in its ruling. Prior testimony of Guthrie, Pro, and Kitzer clearly constituted "sufficient and adequate" independent evidence of the existence of the conspiracy charged. Moreover, we are satisfied that the objected-to testimony was merely cumulative evidence and that its exclusion would not have changed the result.

3. Issue of prejudicial error in district court's allowance of testimony concerning Kitzer's and appellant's alleged affiliation with the Seven Oaks Bank.

█ Following a cautionary instruction to the jury by the district court,[13] Kitzer testified, *inter alia*, that he was the owner of the Seven Oaks Bank of Kent, England, a sham which, although chartered, was insolvent; that in January of 1977 he met with appellant and Bendis at the Shaker House Hotel, which was in bankruptcy, for the purpose of giving appellant a letter of credit for approximately $600,000 on the Seven Oaks Bank which would be used to enable appellant to get control of the Hotel; that at the time he (Kitzer) told appellant and Bendis that the letter of credit would not pay under any circumstances and the bank was "totally hopelessly insolvent."

Appellant, in his brief, admits that the testimony was admitted "not to prove char-

**12.** Rule 801. Definitions

. . . . .

(d) Statements which are not hearsay. A statement is not hearsay if—

. . . . .

(2) . . . The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**13.** The instruction was as follows:

Cautionary Instruction number 1 that I want to give you at this time is as follows: Let me instruct you at this point that evidence concerning alleged wrongs or acts other than those charged in the indictment is normally not admissible to prove the crimes

charged. The evidence which is now being admitted however, is admitted under Federal Rules of Evidence 404(b), which states in pertinent part as follows:

Evidence of other wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may however be admissible for other purposes such as proof of motive, intent, plan, knowledge or absence of mistake. Now I am admitting this evidence for these purposes alone and you are to consider it only for these limited purposes. The testimony, of course, pertains only to the particular Defendant or Defendants which it concerns.

acter as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it," but argues that such testimony "caused undue prejudice and totally outweighed the probative value of the evidence in view of the availability of other means of proof and other factors [unspecified] appropriate for making decisions of this kind."

We are not persuaded that the district court abused its discretion in allowing the Seven Oaks Bank testimony, and we are satisfied that the testimony related to a transaction sufficiently close in time to the actions charged in the indictment to be probative of "motive, intent, plan, knowledge or absence of mistake." *See United States v. Nolan*, 551 F.2d 266, 271 (10th Cir. 1977). Moreover, as pointed out by the Government, the court bent over backwards to avoid possible prejudice to appellant by excluding (sua sponte) from the cautionary instruction the word "crimes" in the phrase "Evidence of other crimes, wrongs, or acts is not admissible . . ." when it referred to Rule 404(b). Nor did appellant's counsel object to the cautionary instruction when the court proposed it to counsel before giving it to the jury. *See United States v. Greene*, 442 F.2d 1285, 1288 (10 Cir. 1971).

4. Issue of district court's denial of Motion in Limine.

■ Appellant argues that the district court abused its discretion in denying his Motion in Limine to direct the Government to not directly or indirectly introduce testimony concerning his guilty plea to a 1976 violation of Section 2913.11(A), Ohio Revised Statutes, which makes it a misdemeanor for "[a] person, with purpose to defraud, [to] issue . . . or cause to be issued or transferred a check or negotiable instrument, knowing that it would be dishonored." Without citation of authority, appellant states:

In reading Federal Evidence Rule 609(A) [*sic*] (2), and in reading the congressional Action and Discussion on Rule 609 . . ., it appears . . . that it was not the intent of the committee to

permit a bad check charge to come within the purvue [*sic*] of the involved dishonesty or false statement clause.

Rule 609(a) provides:

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) *involved dishonesty or false statement, regardless of the punishment.* [Emphasis added.]

Clearly the rule is broad enough to cover conviction of a misdemeanor for issuing a bad check, and the Report of the Conference Committee of the Congress underscores the intent that there be such broad coverage, thus:

By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

The admission of prior convictions involving dishonesty and false statement is not within the discretion of the Court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted. Thus, judicial discretion granted· with respect to the admissibility of other prior convictions is not applicable to those involving dishonesty or false statement.

Rules of Evidence, Conference R.No.93–1597, 93d Cong., 2d Sess. 9 (1974); *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 7051, 7098, 7103. Rather than disclosing an intent that conviction on a bad check charge not come within the "dishonesty or false statement" clause, the Report evi-

dences the opposite intent and, further, that a trial court is not to have any discretion in the matter because such convictions "are always to be admitted."

We note that, although the certified copy of his record of conviction was shown to appellant during cross-examination by the Government, it was not offered into evidence; and appellant and his counsel presented explanation and statements in mitigation of the conviction.

Accordingly, we are satisfied that there was no error in the court's denial of the Motion in Limine.

5. Issue of district court's denial of new trial on ground of newly discovered evidence.

■ As earlier noted (note 2, *supra*), appellant has appealed from the district court's denial of a second motion for a new trial grounded on his allegation of newly discovered evidence. The essential "facts" alleged in support of the motion were that Mangiameli was in England at the time of the trial of appellant, Bendis, and D'Amato; that had he been present at the trial he would have testified that he was at the meeting in New York City involving appellant, Bendis, D'Amato, Pro and others and that there was no mention of Bernard Baker or that there was ever any scheme to defraud Baker of $110,000; that when the $110,000 money order was delivered to Trident in New York City, it was not cashed there because of the bad financial reputation of Trident; that Trident through Pro gave no indication of intent to default on its obligation to Baker; that when the mon-

ey order was delivered at Cleveland, there was never any discussion that it had been obtained by fraud or that any fraud was ever intended; and that when the parties met in the coffee shop of the Shaker House Hotel, there was no discussion that the money order had been obtained by fraud.

In its MEMORANDUM AND ORDER denying the motion, the district court concluded that the evidence was neither newly discovered nor likely to produce a different result at a second trial. It said:

The proposed testimony of Mangiameli is not "newly discovered", it is "newly available" at best. More importantly, it was available to defendants at trial in the form of the F.B.I. statements to which we referred earlier. Had defendant Mucci placed the second statement,[14] made in Kansas City, before the jury it certainly would have impeached the testimony of the undercover F.B.I. agents and supported the testimony of Mucci and Bendis. If Mangiameli did not know the money order was taken by fraud, as the written report indicates he said, then he could not have told Mucci, Bendis and D'Amato that it was, as the F.B.I. agents testified. Mucci did not choose to place *that evidence before the jury; nevertheless, it was available.*

The court noted that the Government had pointed out that this was an "open file" case and that defense counsel had full access to the Government's file which contained the F.B.I. statements. Appellant has not disputed this. Thus, the requirement that such evidence actually be discovered after trial or could not, with reasonable

14. The first statement, dictated October 12, 1977, by F.B.I. agent Myron Fuller relates to an interview of Mangiameli by Fuller and F.B.I. agent Edward Cunningham on October 7, 1977, in London, England, and discloses admissions consistent with the Government's evidence subsequently presented at trial. The second statement, dictated April 21, 1978, by F.B.I. agent F. Brooks Black relates to an interview of Mangiameli by Black and F.B.I. agents Vernon Mitchem and James Wedick on April 17, 1978, in Kansas City, Missouri. The statement, in pertinent part, reads:

MANGIAMELLI admitted transporting a $110,000 money order from New York City to Cleveland, Ohio, in June 1977. He said he

did not know the money order had been obtained by fraud. He thought FRED PRO was running a legitimate business and had no guilty knowledge. MANGIAMELLI claimed he did not know a $109,000 refund check issued to BERNARD BAKER had been bad when issued.

MANGIAMELI said he did not know the "cowboys" had been ripped off when FRED PRO sent him to Cleveland, Ohio, with the money order.

. . . . .

The money order was to be split with $30,-000 going into the Bendis trust account with MUCCI returning to New York City with the other $80,000.

diligence, have been discovered and produced at trial, has not been satisfied. *United States v. Allen*, 554 F.2d 398, 403 (10th Cir.), *cert. denied* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *United States v. Maestas*, 523 F.2d 316, 320 (10th Cir.1975). As to the unlikelihood that the proposed testimony of Mangiameli would produce a different result at a second trial, the district court observed that two of the three defendants took the stand and denied the testimony of the Government's witnesses Kitzer, Pro, Guthrie, and the two undercover F.B.I. agents; that the jury obviously chose to believe the Government's witnesses; that Mangiameli's proposed testimony would be merely cumulative and impeaching; and that such testimony would be neutralized by the October 1977 statement of the interview of Mangiameli in London. *See United States v. Jackson*, 579 F.2d 553 (10th Cir.), *cert. denied sub nom. Allen v. United States*, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978).

In view of the foregoing, we hold that the district court did not abuse its discretion in denying appellant's motion.

The orders of the district court must be affirmed.

AFFIRMED.